```
                              [C.A. 13-3500, Doc. Nos. 233, 247]
                              [C.A. 13-3715, Doc. Nos. 268, 277]
                              [C.A. 13-4578, Doc. No. 230]

               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
                         CAMDEN VICINAGE
```

| | |
|---|---|
| SAM YOUNES, et al.,<br><br>        Plaintiffs,<br><br>  v.<br><br>7-ELEVEN, INC.,<br><br>        Defendant. | Civil No. 13-3500 (RMB/JS) |
| 7-ELEVEN,<br><br>        Plaintiff,<br><br>  v.<br><br>KARAMJEET SODHI, et al.,<br><br>        Defendants. | Civil No. 13-3715 (MAS/JS) |
| NEIL NAIK, et al.,<br><br>        Plaintiffs,<br><br>  v.<br><br>7-ELEVEN, INC.,<br><br>       Defendant. | Civil No. 13-4578 (RMB/JS) |

**MEMORANDUM OPINION AND ORDER**

1

This matter is before the Court on the motions to compel production of metadata filed by the franchisee parties.[1] The Court received 7-Eleven's opposition and cross-motions for protective orders against the production of metadata. The Court held oral argument on March 6, 2015. The Younes plaintiffs seek the production of metadata for 40 documents (including two Excel spreadsheets, P-33b and P-37).[2] The Naik and Sodhi plaintiffs seek the production of metadata for 49 documents.[3] 7-Eleven seeks to bar the production of all metadata. For the reasons to be discussed plaintiffs' motions are GRANTED and 7-Eleven's cross-motions are DENIED. 7-Eleven will be directed to produce all requested metadata.

Background

The relevant background facts will be briefly summarized. Plaintiffs are 7-Eleven franchisees in 7-Eleven's "Penn/Jersey Zone." The zone encompasses the geographic area where the plaintiffs' stores are located. Plaintiffs allege, inter alia,

---

[1] The franchisees are named plaintiffs in Younes and Naik, and the named defendants in Sodhi. Because the interests of the franchisees are aligned, they will be collectively referred to as "plaintiffs" or the "franchisees."

[2] The Court notes that some of the document requests are not single documents but a range of documents. Additionally, two of the Younes plaintiffs' requests are duplicative: SEI11194 and SEI16560 (P-33b).

[3] Of these 49 documents the Naik and Sodhi plaintiffs request there are two documents that also appear on the Younes list: SEI16623 and SEI16649.

2

that they were "targeted" by 7-Eleven for franchise termination. Plaintiffs contend that 7-Eleven wanted to "churn" its franchises so it could collect windfall franchise fees from new franchisees. Plaintiffs also allege 7-Eleven targeted franchisees who were vocal in their criticism of 7-Eleven. In addition, plaintiffs allege they were targeted because of their national origin.[4]

The Younes plaintiffs pleaded their targeting allegations in their complaint:

> 19. Plaintiffs believe and therefore aver that Defendant has devised a plan to terminate the Franchise Agreement with each of the Plaintiffs. The plan is twofold: (1) to make the business conditions so hostile that Plaintiffs will each want to terminate the franchise agreement; and (2) to create artificial and false evidence that Plaintiffs have violated the Franchise Agreement as a way to intimidate the Plaintiffs into surrendering the franchise.
>
> 20. It is believed and therefore averred that Defendant has used intimidation tactics or unfair practices to terminate a number of other franchises in the South New Jersey region.
>
> 21. At least two of these former Franchisees were told by Defendant's agents that they were among the first to have their Franchise Agreement terminated, and that Defendant was going to "take back" each store and terminate each and every Franchise Agreement in South Jersey.
>
> 22. A terminated franchise is a windfall to the Defendant.

---

[4] The franchisee plaintiffs do not all make the same allegations.

> 23. When a franchise is terminated and then sold to a new franchisee, it is believed and therefore averred that Defendant also presents a different Store Franchise Agreement with terms that are more favorable to the Defendant; Defendant gets paid for the franchise again, and gets a new Franchise Agreement with more favorable terms.

Compl. ¶¶ 19-23 [C.A. No. 13-3500, Doc. No. 1-3]. Sodhi alleged in his counterclaim that he was retaliated against because of his active involvement with the Franchise Owners Associations ("FOA"). See Am. Counterclaim ¶¶ 12-13 [C.A. No. 13-3715, Doc. No. 4]. The Naik plaintiffs alleged in their complaint:

> 44. 7-Eleven is targeting certain owners, many of whom run successful operations, and is making serious allegations of labor and other violations, without even a scintilla of proof.
>
> 45. 7-Eleven routinely targets Asian/Pacific Rim/Middle Eastern First/Generation American [sic] franchisees, due to their perceived unfamiliarity with United States laws.
>
> 46. By way of example only, when interrogating Asian/Pacific Rim/Middle Eastern First/Generation [sic] American franchisees, and making unannounced visits to their stores, 7-Eleven representatives routinely make derogatory references to Asian/Pacific Rim/Middle Eastern First/Generation [sic] American franchisees.
>
> 47. 7-Eleven by way of its harassing and targeted faux "investigations" discriminates against certain franchisees based upon their race and national origin in violation of the New Jersey Law Against Discrimination ("LAD").

Plaintiffs contend that 7-Eleven referred to its churning efforts as "Project P" or "Project Philly." Am. Compl. ¶¶ 44-47 [C.A. No. 13-4578, Doc. No. 4]. 7-Eleven denies plaintiffs' allegations. It argues it did not act with a nefarious purpose

4

and it merely attempted to root out fraud and corruption committed by certain franchisees. 7-Eleven asserts that the referenced projects were "staffing initiatives" which grew from the anticipated termination of multiple franchise agreements following investigations for franchise fraud.

Despite 7-Eleven's vigorous denials, plaintiffs' allegations are not made up out of whole cloth. The affidavits/certifications of former 7-Eleven employees Kurt McCord (April 29, 2014)[5], John Spavlik (September 8, 2014)[6], and Ian Shehaiber (2) (October 24, 2014, December 8, 2014)[7] support plaintiffs' contentions. These witnesses were privy to 7-Eleven's internal workings while employed at 7-Eleven. McCord was a Corporate Investigations Supervisor for seven (7) months in 2013. See McCord Cert. ¶ 2. He stated that 7-Eleven engaged in a "scheme" to "churn" and "take back" franchises so they could be resold. Id. ¶¶ 6, 7, 12. He alleged that 7-Eleven disguised its churning initiative under the guise of an "Asset Protection (Loss Prevention) Department." Id. ¶¶ 15, 16. McCord corroborated plaintiffs' allegation that 7-Eleven targeted "vocal" franchisees, including Sodhi. Id. ¶¶ 45-47. Spavlik worked as a Field Consultant for 7-Eleven from 2006-2013. See

---

[5] See C.A. No. 13-3715, Doc. No. 98-2.

[6] See C.A. No. 13-3500, Doc. No. 153-1, Exhibit D.

[7] See C.A. No. 13-3500, Doc. No. 163-15, Exhibit V.

Spavlik Aff. ¶ 2. Spavlik also stated that 7-Eleven engaged in a practice of "targeting" franchises. Id. ¶¶ 6-8. And he stated that he was told these efforts "originated from the upper levels of 7-Eleven's franchise headquarters in Dallas, Texas." Id. ¶ 7. Shehaiber was formerly employed by 7-Eleven as a Senior Field Consultant/Market Manager. See Shehaiber Cert. ¶ 3. His two certifications are consistent with McCord and Spavlik but he goes into more detail regarding the specifics of 7-Eleven's conduct. For example, he alleges that in July 2012 he was placed in charge of "Project P." October 30, 2014 Cert. ¶ 12. He contends "it became increasingly clear that Project P had malicious and improper racial undertones." Id. ¶ 17. Shehaiber also contends 7-Eleven's take-back efforts targeted franchisees with the greatest influence in the franchise community. Id. ¶ 20. In addition, he alleges that 7-Eleven has "every reason to hide the existence of [Project P] as it was racially motivated in targeting both Indian franchisees, and franchisees that were opinionated, successful and involved in franchise associations." December 8, 2014 Cert. ¶ 26. 7-Eleven gives these witnesses little credence. It contends that their affidavits/certifications are not credible because they were executed by biased former employees who have not yet been deposed.

6

During the course of the case plaintiffs learned about a significant 7-Eleven effort addressing the actual or possible take back of 7-Eleven franchises, including those of plaintiffs Younes, Atalla and Sodhi. 7-Eleven referred to this effort in various ways including "Operation Philadelphia," "Operation P," "Project Philly," "Philly Project," "Project P," "Operation Take Back," "Philadelphia Project" and "Penn/Jersey Project." The parties vigorously dispute the purpose of 7-Eleven's efforts. 7-Eleven contends the referenced project was a legitimate effort to staff the stores it took back following findings of non-curable fraudulent conduct by franchisees. Plaintiffs contend the project was exactly what is set forth in the affidavits/certifications of McCord, Spavlik and Shehaiber. No matter what the real purpose of the project was, it is clear that it involved a significant undertaking involving high level 7-Eleven personnel as well as in-house and outside counsel.

To put it mildly plaintiffs have had a difficult time obtaining 7-Eleven's documents regarding Project P. Plaintiffs initially believed Project P was internally referred to by 7-Eleven as "Operation Philadelphia". After first denying that Operation Philadelphia existed, 7-Eleven has slowly come around and has produced some documents related to Project P. Nevertheless, 7-Eleven has produced documents in dribs and drabs and even after months of discovery and numerous court

7

conferences addressing discovery disputes, 7-Eleven acknowledges that not all relevant, requested and non-privileged Project P documents have been produced.[8] Moreover, some of the key documents produced thus far are not dated and do not list the author or recipients. For example, plaintiffs request metadata for Deposition Exhibit P21. This document is a diagram created by 7-Eleven with the name of a Sodhi plaintiff. The document does not identify the date the document was created, who authored it, and to whom it was distributed. Plaintiffs' efforts to "get to the bottom" of the document at 7-Eleven's depositions have been unsuccessful. The Court's efforts to get 7-Eleven to explain the document at oral argument were also unsuccessful. Exhibit 21 is not an aberration. Other key 7-Eleven documents have been produced without important identifying information.[9] Exhibit P26 is a good example of an important document whose preparation and distribution is mysterious. This PowerPoint presentation is titled "Project P Core Team Kickoff 3/20/2012." Similar to P21, plaintiffs' efforts to "get to the bottom" of this document have been unsuccessful. Further, several key 7-Eleven witnesses deposed to date have either denied the

---

[8] Remarkably, 7-Eleven acknowledged at the March 13, 2014 oral argument on another discovery motion that its response to the Court's October 16, 2014 Order was not complete. The Order required 7-Eleven to produce certain Project P documents by October 28, 2014. See C.A. No. 13-3500, Doc. No. 132 ¶ 4.

[9] See P19, 20, 22, 25, 26, 33b, 38.

8

existence of Project P or claimed not to have relevant knowledge regarding the project. See Younes Br. at 3-5. In addition, 7-Eleven's deposition testimony to date has been largely unsuccessful in clarifying who authored or prepared many of the referenced key documents, where the listed information came from, when the documents were created, and why different versions of certain documents were produced.

The Younes plaintiffs have identified 38 documents and two Excel spreadsheets for which they want metadata. See Younes Br. at 7. For these documents plaintiffs want "the date of origination, author, custodian, date of each modification and author of each modification, and to the extent available, any data which established to whom the document had been electronically distributed." Id. at 8. The Younes plaintiffs argue they need the requested metadata because "information regarding who knew what and when makes the document trail particularly critical in discovery." Id.

The Naik and Sodhi plaintiffs make similar arguments. They seek metadata for an additional 49 documents, two of which are duplicative of the Younes requests. See Cert. of Gerald A. Marks, Esq. ¶ 4. The Naik and Sodhi plaintiffs request the same information from the metadata. Id. ¶ 5. Like the Younes parties these plaintiffs claim they have been unable to obtain key information regarding the documents from 7-Eleven's witnesses.

9

Discussion

Fed. R. Civ. P. 34(b)(2)(E) addresses the production of electronically stored information ("ESI"). A party requesting ESI may specify the form of production, which can include metadata, and the responding party can produce the ESI in the form specified or object.[10] Peterson v. Matlock, C.A. No. 11-2594 (FLW/DEA), 2014 WL 5475236, at *1 (D.N.J. Oct. 29, 2014) (citing Romero v. Allstate Ins. Co., 271 F.R.D. 96, 107 (E.D. Pa. 2010)). Some courts hold that a party must show a "particularized need" for metadata. Wyeth v. Impax Laboratories, Inc., 248 F.R.D. 169, 171 (D. Del. 2006); U.S. ex rel. Carter v. Bridgeport Educ., Inc., ___ F. Supp. 3d ___, 2015 WL 818032, at *19 (S.D. Cal. Feb. 20, 2015) ("[C]ourts have required the requesting party to show a 'particularized need' for the metadata, not simply a generalized view as to its importance.").

To the extent it is necessary, plaintiffs have shown a particularized need for the requested metadata. Plaintiffs have

---

[10] Metadata, commonly defined as "data about data", is "information describing the history, tracking, or management of an electronic document." Williams v. Sprint/United Mgmt. Co., 230 F.R.D. 640, 646 (D. Kan. 2005). It includes "all of the contextual, processing, and use information needed to identify and certify the scope, authenticity, and integrity of active or archival electronic information or records." Id. (citation omitted); United States v. Haymond, 672 F.3d 948, 952 n.10 (10th Cir. 2012) ("Metadata, which is commonly described as 'data about data,' is defined as [s]econdary data that organize, manage, and facilitate the use and understanding of primary data.") (alteration in original).

demonstrated that many of the paper documents produced to date are missing source, date, and other key background information. This missing information is plainly relevant and discoverable. Further, the requested metadata is relevant to authenticating 7-Eleven's documents, especially since the authors or creators of some important documents are unknown. It is not insignificant that plaintiffs only identified a relatively small number of documents for which they request metadata rather than asking for metadata for all documents.

Having established that plaintiffs need the requested metadata, the question becomes whether it should be produced. Generally, the burden "rests with the party objecting to the production of metadata or ESI to show undue hardship or expense." Peterson, 2014 WL 5475236, at *1 (citing Susquehanna Commercial Fin., Inc. v. Vascular Res., Inc., 2010 WL 4973317, at * 13 (M.D. Pa. Dec. 1, 2010)); see also Camesi v. Univ. of Pittsburgh Med. Ctr., C.A. No. 09-85, 2010 WL 2104639, at *7 (W.D. Pa. May 24, 2010) ("a clear showing of undue hardship and/or expense may excuse Defendants' production in native format"). As explained in detail infra, 7-Eleven has failed to show it will suffer undue hardship or expense if it is compelled to produce the requested metadata. Thus, plaintiffs' motions to compel metadata will be granted and 7-Eleven's cross-motions for

11

protective orders to bar the discovery of metadata will be denied.

7-Eleven makes several arguments in opposition to plaintiffs' motions and in support of its cross-motions. It argues: (1) the parties agreed at the outset of the case that documents need only be produced in PDF format without metadata; (2) 7-Eleven does not possess much of the requested metadata; (3) the metadata that is available is "extremely limited, minimally meaningful and potentially misleading"; and (4) it would be "unreasonably burdensome to require 7-Eleven to re-produce [its] … documents with metadata." Def.'s Br. at 1 [Doc. No. 246]. 7-Eleven supports its opposition with the Declaration of its Director of Information Technology Michael Larson, [C.A. No. 13-3500, Doc. No. 246-1]. Larson alleges:

> 6. 7-Eleven does not track, and, therefore, cannot produce: the date of each modification of the listed documents; the author of each modification of the listed documents; or data establishing to whom the documents in question have been electronically distributed.
>
> 7. The only metadata that 7-Eleven does maintain is the metadata embedded in the document itself and preserved by the native application. Of the information sought by the Requesting Parties, the only available metadata is as follows:
>
>> a. The author of the document (however, in many cases, the author will be listed as "7-Eleven, Inc.," to whom the Microsoft license was issued);
>>
>> b. The date the document was created; and

12

> c. The date on which the document was *last* modified and the author of the *last* modification.
>
> No information is captured about whether the document was forwarded or distributed electronically.
>
> . . .
>
> 12. To the extent any meaningful metadata actually existed, 7-Eleven would have to expend substantial additional resources to search for, harvest it, and produce it. Because 7-Eleven operated under an agreement with opposing counsel that no metadata would need to be produced, 7-Eleven harvested and produced documents with no regard for collecting or maintaining the original metadata.
>
> . . .
>
> 16. In sum, the efforts necessary to harvest and produce any available metadata would be time-consuming and costly, and would yield minimal information that is likely to be inaccurate and not meaningful to the parties that [sic] requested it.

Larson Decl. ¶¶ 6, 7, 12, 16.

None of 7-Eleven's arguments are persuasive. It is true that the parties originally agreed not to request metadata. However, good cause exists to modify the agreement. See Susquehanna Commercial Fin., Inc., 2010 WL 4973317, at *14 (regardless of the fact that the parties had agreed on the manner of production, good cause existed for modifying that agreement and compelling the production of metadata where "a number of questions . . . have arisen regarding both the scope of production and, potentially, the adequacy of Plaintiff's prior efforts to locate and identify responsive documents"); Romaro v. Allstate Ins. Co., 271 F.R.D. 96, 105-106 (E.D. Pa

2010) (requiring defendant to produce documents in native format with associated metadata even though early in the case the parties agreed to only produce TIFF images). Had plaintiffs known at the outset of the case the difficulties they would face in obtaining relevant information regarding 7-Eleven's documents, it is unlikely they would have agreed to forego requesting metadata. The changed circumstances plaintiffs face justify modifying their earlier agreement not to request metadata.

Thus far plaintiffs have undertaken substantial efforts to obtain key information about some of 7-Eleven's documents without success. This includes basic information such as who prepared a document and when and to whom the document was distributed. There is no justifiable reason to deny plaintiffs this basic discovery that may exist in 7-Eleven's metadata, especially when 7-Eleven has not offered to voluntarily provide the requested information. 7-Eleven's suggestion that plaintiffs should question its witnesses at their depositions about the requested information is unnecessary and impractical. Plaintiffs should not have to use their limited deposition time to question witnesses about basic issues such as when scores of documents were prepared, who prepared them, who received them, etc. The requested metadata is unquestionably relevant to important

issues in the case. It cannot be gainsaid that plaintiff is entitled to this information.

7-Eleven's argument that it does not have some of the requested metadata and that what it does have is minimally important can be summarily addressed. 7-Eleven only has to produce what is available. The Court does not expect 7-Eleven to produce metadata that does not exist. As for the alleged "minimal importance" of the requested metadata, the Court will let plaintiffs evaluate the importance of their discovery, not 7-Eleven.

7-Eleven's burdensome argument is not convincing. Plaintiffs have demonstrated that the requested information is probative. On the other hand 7-Eleven has not convinced the Court that it would be unduly burdensome or expensive to produce the requested metadata. See Romano, 271 F.R.D. at 107 ("Multiple courts have found that, in light of the emerging recognition of the benefits of producing metadata, the burden falls on the party objecting to the production to show undue hardship and expense."). 7-Eleven does not substantiate the unreasonable burden it will allegedly endure. For example, 7-Eleven argues that "the efforts necessary to harvest and produce any available metadata would be time-consuming and costly, and would yield minimal information that is likely to be inaccurate and not meaningful to the parties that requested it." Larson Decl. ¶ 16.

15

These conclusory allegations do not satisfy 7-Eleven's burden of proof. Larson merely talks in general terms and does not aver specific details about the alleged burden to 7-Eleven beyond the cost per hour to hire a consultant. 7-Eleven will undoubtedly incur some time and cost to retrieve the requested metadata.[11] However, the cost is unlikely to be material in comparison to the stakes in the case and the transaction costs the parties are already incurring. Further, plaintiffs are not requesting metadata for all of 7-Eleven's documents. Plaintiffs only request metadata for a finite number of documents. The Court does not expect the cost to retrieve the requested metadata to be extensive or costly.[12]

---

[11] In the Larson Declaration 7-Eleven suggests that in order to produce metadata it will have to locate original files and "manually analyze them" to determine if the metadata is accurate. Larson Decl. ¶ 13. 7-Eleven states that it will subsequently have to "harvest the documents anew, in a forensic manner." Id. ¶ 14. This is not a high price to pay to get answers to key mysteries in the case. Further, all of the plaintiffs seek the same metadata: the date of origination, author, custodian, date of each modification and author of each modification, and to the extent available, any data which establishes to whom the document had been electronically distributed. See Younes Br. at 8; See Cert. of Gerald A. Marks, Esq. ¶ 5. 7-Eleven shall produce metadata responsive to this Order to the extent it exists.

[12] The Court denies 7-Eleven's request that plaintiffs share the cost of producing its metadata. There is no good cause to detract from the ordinary practice that parties bear their own costs of responding to discovery. See Major Tours, Inc. v. Colorel, C.A. No. 05-3091 (JBS/JS), 2009 WL 3446761, at *5 (D.N.J. Oct. 20, 2009), aff'd, 720 F. Supp. 2d 587 (D.N.J. 2010) ("cost shifting should only be considered when electronic

Conclusion

In summary, plaintiffs' motions to compel metadata will be granted and 7-Eleven's cross-motions to bar the production of metadata will be denied.

**ORDER**

Accordingly, for all the foregoing reasons,

IT IS HEREBY ORDERED this 18th day of March, 2015, that plaintiffs' motions [C.A. No. 13-3500, Doc. No. 233; C.A. No. 13-1715, Doc. No. 268; C.A. No. 13-4578, Doc. No. 230] to compel metadata are GRANTED, and 7-Eleven's cross-motions to bar the production of metadata [C.A. No. 13-3500, Doc. No. 247; C.A. No. 13-3715, Doc. No. 277] are DENIED; and it is further

ORDERED that by April 1, 2015, 7-Eleven shall produce the requested metadata for the documents identified in plaintiffs' moving papers. The documents identified by the Younes plaintiffs are P-33b and P37 and the documents contained in the chart cited in footnote four on pages 7-8 of their brief [C.A. No. 13-3500, Doc. No. 233-1]. The documents identified by the Naik and Sodhi plaintiffs are listed in paragraph four of the Certification of Gerald A. Marks, Esquire [C.A. No. 13-3715, Doc. No. 268-1; C.A. No. 13-4578, Doc. No. 230-1]. The metadata required to be produced is "the date of origination, author, custodian, date of each modification and author of each modification, and to the

---

discovery imposes an undue burden or expense on the responding party.") (citation omitted).

17

extent available, any data which established to whom the document had been electronically distributed"; and it is further

ORDERED that this Order is entered without prejudice to plaintiffs' right to request additional metadata.

                                                 s/Joel Schneider  
                                                 JOEL SCHNEIDER  
                                                 United States Magistrate Judge